## LEW GARRETT v. THE STATE.

1. ACCOMPLICE.—See facts sufficiently corroborating the testimony of an accomplice.
2. MURDER IN THE FIRST DEGREE.—Evidence held sufficient to warrant a verdict for murder in first degree.

APPEAL from San Augustine. Tried below before the Hon. R. S. Walker.

No counsel for appellant.

*George Clark, Attorney General,* for the State.

GOULD, ASSOCIATE JUSTICE.—The appellant stands convicted of the murder of Henry Hunt in San Augustine county, in the month of March, 1874, and his punishment has been fixed at death. He has not been represented by counsel in this court, nor is there any bill of exceptions or

assignment of errors to aid us in performing the duty of examining the record and passing on the legality of proceedings on which hangs the life of a fellow being.

The evidence discloses that on Saturday night, March 7th, of the current year, Henry Hunt was assassinated in his own house by some person who shot him from without and through the door of the house. There is an extreme meagerness of detail of the circumstances surrounding the deceased at the moment he was shot in the evidence in the record. It does not appear, however, that anything transpired in or about the house at the time of the killing throwing light on the question who was the murderer.

Peter Nicholson testifies that on Saturday evening, being the day Hunt was killed, defendant told him "that Jim Lilly had promised to give him twenty-five dollars, and more, if he wanted it, to kill Mr. Hunt." He also testifies that on the next morning after the killing the defendant told him "that Mr. Hunt had robbed Lilly out of his house, had robbed Dick Gamble, and had robbed his son's wife of her cotton; that his children were robbed, and his wife and himself were robbed, and he had put a stop to it. He said he had put one d—d old swindler out of the way, meaning the deceased, Henry Hunt." This witness states, on cross-examination, that he was arrested on a charge of having something to do with the murder of Hunt, and that after he told what he knew about it, he was turned loose, but not on condition that he would tell. He denies any complicity in the murder; but the court charged at length on the hypothesis that the jury might regard him as an accomplice. The Attorney General also assumes that he may, " for the purpose of the argument," be so regarded; and in our own view, the proper disposition of the case involves the question whether, regarding him as an accomplice, his evidence was sufficiently contradicted to justify the verdict. Art. 653 of the Criminal Code is as follows: " A conviction cannot be had on the

testimony of an accomplice, unless corroborated by other evidence tending to convict the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." In order that it may be seen how far this witness is corroborated, we will proceed to state such portions of his evidence as are established by other proof, it being premised that the witness Nicholson, Amanda Garrett, and the defendant, each lived on Henry Hunt's place, at a distance of three or four hundred yards from Hunt's house, and we may infer at no great distance from each other, defendant's home being nearer to Hunt's. He states, as other evidence abundantly establishes, that on the night of the killing there was a prayer meeting at witness's house, at which were present, beside the witness and wife and defendant, Lew Garrett and wife, Jim Lilly, Henry Dodd, and Amanda Garrett; that the defendant, Garrett, left the meeting while it was in progress, leaving his hat behind him, and continued absent from one-half hour to an hour, during which time the gun was fired and the murder committed; that on being called three times by Eph. Johnson, who came from Hunt's house after the killing, defendant answered at the third call, from apparently about thirty steps from the house, in "a wind-broken voice," or, as Amanda Garrett says, " like he was out of breath, worried," and again, " he didn't answer as he usually does," or as Henry Dodd, witness for defendant, says, " like some person that didn't want to answer." That the prayer meeting then broke up, and the parties started up to Hunt's; that on some of the women seeming scared, and not wanting to go, (Amanda Garrett says it was she,) defendant said with an oath, "the one that shot Henry Hunt won't shoot you," or, as Amanda Garrett words it, " they ain't going to shoot any more."

Nicholson further states, that on Sunday evening after the killing, witness and defendant "came back together from digging the grave, and as we got near a little branch on the

road, he was talking to me about the killing of Mr. Hunt. He said there were so many witnesses that this act could not be proved on him. This was just as we reached the branch. Directly after we crossed the branch we saw Mr. Thacher and Mr. Tom Hunt sitting on the fence." Hunt, a nephew of deceased, describes the same circumstance as follows: "James Thacher and myself were sitting on the fence on the side of the road, about thirty steps from a small branch which crossed the road. Defendant rode into the branch a little in advance of Peter Nicholson, and turning towards Nicholson said: 'By G—d, they can't prove it on us. We've got too many witnesses. We got fifteen witnesses.' I don't think they had seen us at that time. They then discovered us, and said nothing further until they rode up to us, and defendant then said: 'This is a d—d bad thing.' No one replied, and then he said: 'There is no chance to try it on me, for everybody in this neighborhood knows I have no gun. I have had uncle Lewis's gun, but I had done carried it home.' Nothing further was said."

James Thacher testified to substantially the same conversation, and says that at that time, so far as he knew, defendant had not been accused of the murder.

The material parts of Nicholson's testimony, in addition to those above stated, may be summed up as follows: That witness had two guns, one of which, an Enfield rifle, defendant had borrowed, but about a week before the killing had returned. That on Saturday morning of the killing he met defendant, who told him that he now had particular use for the gun, and would go and get it. That he did not see him get the gun, and did not notice about it until the next evening after the killing, and the gun was then in the house. That at the prayer meeting Lilly prayed and talked awhile and sung, and when he heard the gun fired and the "crying and hollering" at Hunt's house, he tried to get Lilly to stop singing, but he sung

louder than ever—(Amanda Garrett says it seemed to her that Peter (the witness) and all of them sung louder.) That he then opened his door and went out and spoke to his dog, which was barking, and Lew Garrett then spoke and said: "This fool has been barking at me all night, and I've been standing right here." Eph. Johnson then came and called Lew three times, and at the third call Lew answered in a broken voice, as stated above, being on a trail in the potato patch in the direction of Hunt's, about thirty steps. That Lilly said, "Come on, let's go up and prove ourselves clear;" and as they went up said, "Now, don't you see that my words have come true that I told you all to-night?" That at the house, whilst the white people were in another room, Lilly walked up to the corpse, and looking at it said, "Here he lays, the d—dest old swindler that ever walked shoe-leather."

On cross-examination, this witness said that prayer meeting at his house was not unusual; that he didn't know anything was going to happen that night; didn't know what Lew was going to do; that he didn't like Lew Garrett, because he thought he was a bad man; that he thought Lilly was a grand old villain, and that he had not told what he knew sooner because he was afraid defendant would kill him; that a week or so before Garrett got his gun the last time he was threatening to kill Davenport, a son-in-law of Lilly.

Amanda Garrett proved that on the night of the killing, about half hour in the night, she saw Lilly and Eph. Johnson and defendant at defendant's house, and then heard Lilly talking about Mr. Hunt. He said that Mr. Hunt had cheated and swindled him out of his horses. At the prayer meeting, when Lilly came in he said, "My friends, I am going to sing to night, and it shall be long remembered and never forgotten." After testifying about Garrett leaving the house, she says: "About an hour after Lew left the house, as near as I can guess, I heard a gun

fire in the direction of Mr. Hunt's house. I said to Lew's wife: Listen, wasn't .that a gun? She said, 'No, it might be a tree.' I then heard children hollering, and said to her: Listen, wasn't that children hollering. She said, 'No, it's dogs barking.' I said, No, its children—listen; but they didn't stop singing, and Lew's wife said, 'Sing on, brother Jim;' and he raised the singing higher and louder, and they sung on till Ephraim came and called defendant. As they went up to the house Lilly said: 'Now, my friends, this is the same thing we was talking about to-night, and you see how true it's come.' Lew replied, 'Yes, that's so; we were talking of this same thing.'" This witness testifies that during the singing Lilly stopped, and looking at defendant's wife, asked, "Arn't Lew come back yet?" Nicholson swears to the same question.

Henry Dodd, for the defense, testifies that he was at the prayer meeting; heard the gun; but it did not appear to him that the singing was any louder at that time, or that there was any difference in the conduct of the persons there. He states that Garrett, after Lilly had prayed one prayer, left the meeting, leaving his hat under the bench, and that he did not see him again until after the gun fired, and further corroborates Nicholson as to where defendant was when Johnson called him, and says he answered like some one who didn't want to answer. He says that on their way to the house he was behind the others and heard nothing said.

Eph. Johnson, for defense, was at Hunt's when he was shot, and at Mrs. Hunt's request went for a neighbor after the shooting, and in going went by Lew Garrett's to tell him and the others to come up; that as he rode along the road, he called defendant three or four times before he answered; recognized him by his voice; thinks they were not singing at the meeting after he left Hunt's. His evidence is not otherwise material, except as it shows that

Lilly was complaining that night of Hunt's attaching his horses, and accusing him of cheating him. This was at Garrett's house, but not in Garrett's presence.

It was in evidence that deceased had sued Lilly, and at different times had seized two of his horses; that Lilly appeared mad, and talked a great deal, and said: "These Wallace horses (two of which deceased had levied on) have caused more trouble than all the horses in the county, and there will be somebody killed about them yet; mind what I say."

On the other hand, it was in evidence by a son of deceased that Lilly had been at Hunt's house having a settlement that day, and they settled all their accounts, except a mortgage; that they seemed friendly, and a receipt given to Lilly on that day was in evidence; that his father told Lilly to come back next morning and they would settle the mortgage, and told him to put his horse up and go and stay all night with defendant. This witness also proved that defendant came to the house after his father was killed, and that it was proposed to him to go after witness' brother, some seven miles. Defendant refused to go, but did go after the doctor about the same distance.

It was proved by defendant that he remained about home as usual after Hunt was killed, and made no attempt to escape, and was arrested at home two or three days after the killing.

Defendant's wife testified that she was at the prayer meeting; heard the gun fire; did not notice any difference in the singing. Eph. Johnson came calling for Lew, and said Hunt was killed, and then they all went to Hunt's house coolly and evenly, so far as she saw. Never heard her husband say he intended to hurt Mr. Hunt, and was surprised to hear of his being killed. Lilly's wife testified that she never heard of any plot to kill Hunt.

There was some evidence that during the war deceased had been engaged in hunting deserters, and that he and

his company did some acts that created bad feelings at the time. Another witness says he thought these things were all reconciled.

Richard Gamble was introduced by defendant, and proved that on the Saturday evening of the killing defendant came to see him at his house about building a turkey pen; that witness told him he did not have time. Had no other talk with him. Witness soon left, and left defendant sitting at his house. When he got back the sun was about one and a half hours high, and defendant was gone.

On cross-examination this witness stated that he had previously made and sworn to a statement about the killing, and that it was all a lie; that it was made whilst he was under arrest, &c., and that defendant did not make the statements that witness said he did in that sworn statement. The statement of facts then reads: " The following is the statement referred to," and sets out a copy of a paper purporting to be signed and sworn to by Gamble on March 12, 1874, reciting the visit of defendant to his house on Saturday evening, his conversation about the turkey pen, but proceeding to detail other conversation with defendant, at the same time strongly implicating defendant, also stating other and subsequent facts of the same nature, to the effect that defendant did the killing.

A careful examination of the evidence satisfies us that it justifies the verdict. The leading facts, that defendant absented himself from the prayer meeting at the time and in the way he did, leaving his hat behind, and remained absent until after the gun was fired, (this absence being wholly unaccounted for,) and that after the killing he is first seen in the direction where the killing was done, and apparently laboring under excitement, physical or mental, are well established by evidence other than that of Nicholson, and in fact by the witness Dodd, introduced for the defense. The coincidence of the time of his absence with

the time of the murder, coupled with the place where he is found, and his excitement or indisposition to answer, coupled also with the absence of any attempt by defendant to explain any of these facts, sufficiently tends to connect defendant with the killing, to amount to a corroboration of Nicholson's testimony.

The conversation at the branch was established by two other witnesses, and also tends to show defendant's guilt with force. There is no evidence of any other matter or charge to which the assertion " they can't prove it on us" might refer. The remark, " we've got too many witnesses," is intelligible as referring to those at the prayer meeting; and the further remark that it could not be laid on him or them shows that his mind was on the subject, although he had not, it appears, then been accused of the murder. It is true that this conversation contains no direct admission of guilt. It seems, however, more reasonable to regard it as a conference between two actually guilty, than to interpret it on the supposition that two innocent parties not accused of the crime were estimating their means of defending themselves against a charge not then made. And in this connection defendant's reply to Lilly, as they went to the house from the prayer meeting, " Yes, that is so; we were talking of this same thing," is not without significance.

These facts, established by other witnesses than Nicholson, sufficiently corroborate his statements to justify the jury in giving credit to his testimony, and in connection with that testimony justify the verdict. If Nicholson is to be believed, defendant is guilty. The jury were properly instructed as to the necessity of corroboration, and cautioned to weigh carefully the evidence of an accomplice, especially as to admissions by defendant. They have found a verdict of guilty, and that verdict has received the approval of the court below. Whilst we think that this case illustrates the wisdom of the rule requiring

accomplices to be corroborated, and can but feel how unsatisfactory would be the unsupported testimony of Nicholson, whether he was an accomplice or not, looking at all the evidence, we have had but little difficulty in arriving at the conclusion that the verdict is right and must stand.

The question remains, has any error been committed in the charge or the rulings of the court. The charge was full and clear. It was not objected to by defendant, and in our opinion gave him the full benefit of the law. No charges appear to have been asked by defendant, nor was any ruling of the court excepted to. Under the settled rule that objections to the admissibility of evidence will not be considered in this court which were not made in the court below, we might decline to notice any questions of that nature suggested in defendant's motion for new trial, or from an examination of the record. The motion for new trial sets forth that evidence of conversations and acts of others, to which defendant was not a party, and not in his presence, was erroneously admitted, and specification is made of proof of what occurred at the prayer meeting after defendant left the same. It is believed that what occurred at the prayer meeting is so closely connected with the facts attending the killing, that no part of it could well have been excluded, especially in view of the fact that the case, apart from the admissions of defendant, is one of circumstantial testimony. Proof of what Lilly said and did there and at other times is admissible as tending to show his connection with the murder. It must be borne in mind that, according to defendant's statements, as proved by Nicholson, he and Lilly were acting in concert. Proof tending to establish Lilly's guilt goes to strengthen the evidence of Nicholson, and at the same time to strengthen the circumstantial evidence giving probability to the supposition that defendant absented himself and committed the act, relying

on his accomplice or accomplices at the prayer meeting to prove him clear.

As to the admission of the affidavit of Gamble, this question is not made even in the motion for new trial. From the manner in which it is introduced in the statement of facts, we think it doubtful whether it was really used in evidence as therein presented, and, under these circumstances, we do not feel justified in treating the question as properly before us.

In the discharge of duty it only remains for us to order that the judgment below be affirmed, and it is so ordered.

AFFIRMED.