## ANDY SCRIBNER v. STATE.

No. 735.   Opinion Filed May 31, 1913.

(132 Pac. 933.)

1. **CONSTITUTIONAL LAW—Construction.**   Constitutional provisions should receive a broader and more liberal construction than is applied to statutes. The question is not so much what the convention meant which framed the Constitution, but the supreme and controlling question is, What did the people mean whose votes adopted and placed the Constitution in force?

2. **SAME.** A narrow, technical, forced, or unnatural construction should never be placed upon the language of a constitution; neither should courts indulge in or follow any ingenious refinements or subtlety of reasoning as to the meaning of its provisions.

3. **WITNESSES—Privilege of Accused—Right to Waive.** Section 21 of the Bill of Rights of the Constitution, which, among other things, provides that "no person shall be compelled to give evidence which will tend to incriminate him, except as in this Constitution specifically provided," simply protects each person in the right of silence. It does not mean that he shall not be allowed or permitted to give testimony which may tend to incriminate him. The right of silence is one which may be waived, either by contract or by the voluntary act of the witness, and is waived if the right is not asserted in apt time.

4. **SAME—Immunity—Conditions.** Before any person can secure immunity under section 27 of the Bill of Rights of our Constitution on account of incriminatory evidence, given by him as a witness before a grand jury, or in any court, such witness must have testified under an agreement made with the prosecuting attorney, approved by the court, or such witness must have claimed the privilege of silence, which was by the court denied, and such witness must have been compelled by the court to so testify. Immunity

will not then be granted unless such witness acts in good faith with the state, and testifies truthfully and fully as to all material facts within his knowledge touching the matter under inquiry.

5.    **SAME—Plea in Bar.** A plea of immunity cannot be presented by demurrer, and should not be submitted to a jury under a plea of not guilty, but must be raised alone by a plea in bar, in support of a motion addressed to the court, which plea and motion should be by the court decided without the intervention of a jury.

6.    **APPEAL—Ground for Reversal.** Under section 6005, Rev. Laws 1910, no judgment of conviction can be set aside or new trial granted on the ground of a misdirection of the jury, or improper admission or rejection of evidence, or as to any error in the matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire record, it appears that such error constitutes a material violation of the constitutional or statutory rights of a defendant, or probably resulted in a miscarriage of justice.

(Syllabus by the Court.)

*Appeal from District Court, Pontotoc County;*
*Robert M. Rainey, Judge.*

Andy Scribner was convicted of murder, and he appeals. Affirmed.

*Crawford & Bolen,* for appellant.
*Chas. West,* Atty. Gen., *Smith C. Matson,* Asst. Atty. Gen., and *Robert Wimbish,* Co. Atty., for the State.

FURMAN, J.  Counsel in their brief contend that the court erred in not sustaining the plea in bar and in not discharging the defendant. The record shows that on the 12th day of June, 1909, an indictment was returned in the district court of Pontotoc county, wherein Andy Scribner, John Scribner, Dan Scribner, and Frank Scribner were jointly charged with the murder of one Lillie Scribner. On the 9th day of November thereafter appellant filed a motion to abate said action, upon the ground that he had given testimony before the grand jury having the killing of Lillie Scribner under investigation, in which he testified to facts and circumstances which tended to show that Frank Scribner was guilty of said

murder. A determination of this question involves a construction of section 21 of the Bill of Rights of the Constitution of Oklahoma, which, among other things, provides:

"No person shall be compelled to give evidence which will tend to incriminate him, except as in this Constitution specifically provided."

And also a construction of section 27 of the Bill of Rights of the Constitution of Oklahoma, which is as follows:

"Any person having knowledge or possession of facts that tend to establish the guilt of any other person or corporation charged with an offense against the laws of the state, shall not be excused from giving testimony or producing evidence, when legally called upon so to do, on the ground that it may tend to incriminate him under the laws of the state; but no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may so testify or produce evidence."

In construing a statute or constitutional provision the viewpoint of the court is a matter of first importance. Courts of equal ability, learning and integrity, viewing the same questions from different standpoints, will arrive at different conclusions. The importance of the viewpoint of the court, and the consequences resulting therefrom, is clearly pointed out and illustrated in the case of *State v. Coyle,* 8 Okla. Cr. 686, 130 Pac. 316. The policy of this court is to construe penal statutes liberally, in order that they may accomplish the purposes for which they were enacted, and in furtherance of justice. In other words, we believe that penal statutes should be made to reach and destroy the evils at which they were aimed by the Legislature. See *Caples v. State,* 3 Okla. Cr. 72, 104 Pac. 493, 26 L. R. A. (N. S.) 1033. Constitutional provisions should receive a broader and more liberal construction than is applied to statutes. The rule of construction of a statute is the intention of the Legislature. In construing constitutional provisions the question is not so much what the convention meant which framed the Constitution, but the supreme and con-

trolling question is what the people whose votes adopted and placed the Constitution in force intended.

Mr. Cooley, in his work on Constitutional Limitations, p. 89, says:

"The object of construction, as applied to a written Constitution is *to give effect to the intent of the people in adopting it.*"

On page 92 the same author says:

"In interpreting clauses we must presume that *words have been employed in their natural and ordinary meaning.* As Marshal, C. J., says: 'The framers of the Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.' This is but saying that no forced or unnatural construction is to be put upon their language, and it seems so obvious a truism that one expects to see it universally accepted without question; but the attempt is made so often by interested subtlety and ingenious refinement to induce the courts to force from these instruments a meaning which their framers never held that it frequently becomes necessary to redeclare this fundamental maxim. Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government."

On page 101 the same author says:

"When the inquiry is directed to ascertaining the mischief designed to be remedied, or the purpose sought to be accomplished by a particular provision, it may be proper to examine the proceedings of the convention which framed the instrument. Where the proceedings clearly point out the purpose of the provision, the aid will be valuable and satisfactory; but where the question is one of abstract meaning, it will be difficult to derive from this source much reliable assistance in interpretation. Every member of such a convention acts upon such motives and reasons as influence him personally, and the motions and debates do not necessarily indicate the purpose of a majority of a convention in adopting a particular clause. It is quite possible for a clause to appear so clear and unambiguous to the members of a convention as to require neither discussion nor illustration; and the few remarks made concerning it in the con-

vention might have a plain tendency to lead directly away from the meaning in the minds of the majority. It is equally possible for a part of the members to accept a clause in one sense and a part in another. And even if we were certain we had attained to the meaning of the convention, it is by no means to be allowed a controlling force, especially if that meaning appears not to be the one which the words would most naturally and obviously convey. For as the constitution does not derive its force from the convention which framed but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed. These proceedings therefore are less conclusive of the proper construction of the instrument than are legislative proceedings of the proper construction of a statute, since in the latter case it is the intent of the Legislature we seek, while in the former we are endeavoring to arrive at the intent of the people through the discussions and deliberations of their representatives. The history of the calling of the convention, the causes which led to it, and the discussions and issues before the people at the time of the election of the delegates, will sometimes be quite as instructive and satisfactory as anything to be gathered from the proceedings of the convention."

We might multiply citations to the same effect indefinitely. This is not only the law of the land, but it is in harmony with the divine law, which declares, "For the letter killeth, but the spirit giveth life." See 2 Cor. iii, 6. In construing constitutional provisions we will never place a narrow, technical, forced, or unnatural construction upon their language; neither will we indulge in or follow any ingenious refinement or subtlety of reasoning as to the meaning of such provisions. See *State v. Frisbee,* 8 Okla. Cr. 406, 127 Pac. 1091. But we will endeavor to give them that interpretation which every man, learned and unlearned, and of common understanding, must place upon them. To do this in-

telligently we must first understand the origin, history, and reasons which lie at the foundation of each provision.

We will first consider the origin and history of and the reasons for the principle involved in section 21 of the Bill of Rights of the Constitution of Oklahoma, which directs that "No person shall be compelled to give evidence which will tend to incriminate him, except," etc. This is but a reiteration of the common law. Under the Anglo-Saxon rule in England the bishops, on account of their supposed learning and goodness, sat as judges and entertained suits in the popular courts; but during the eleventh century they were required to decide their causes according to the ecclesiastical law. From this there sprang up in England two separate systems and a double judicature. At first trials were conducted by compurgation and by ordeal, but those modes of trial were abolished during the thirteenth century. The ecclesiastical courts then resorted to inquisitorial and incriminating questions addressed to the accused. What was known as the Court of Star Chamber was established in 1487, which was the successor to and which followed the precedents established by the ecclesiastical courts. In 1606 Sir Edward Coke was made Chief Justice of the Court of Common Pleas of England. He first began to resist the encroachments made by the Court of Star Chamber upon personal liberty with its inquisitorial questions. This contest culminated in 1637 when one John Lilburn was committed to prison by the counsel of the Star Chamber because he declined to take an oath which required him to answer inquisitorial questions. Lilburn subsequently presented a petition to Parliament demanding redress for the treatment which he had received at the hand of the Court of Star Chamber. The illegality of his sentence was argued upon the ground that to require a man to be his own accuser was contrary to the laws of God, of nature, and of the Kingdom. The House of Lords ordered that the sentence pronounced against Lilburn should be "totally vacated, as illegal and most unjust against the liberty

of the subject and the law of the land and the Magna Charta."
Three thousand pounds was awarded him as a reparation for
the injury done. A law was enacted which forbade any court
from compelling witnesses to answer inquisitorial questions
as to matters penal which would involve the incrimination of
the witness. This is the origin of the common law provid-
ing that no witness shall be compelled to give evidence which
will tend to incriminate him. For a full presentation of this
question, see 15 Harvard Law Review, p. 610, published in
1902. See, also, Wigmore on Evidence, vol. 4, pp. 2250
to 2282.

An early discussion of the principle involved in section
27 of the Bill of Rights of the Constitution of Oklahoma,
which provides that a witness shall not be excused from an-
swering questions upon the ground that the answers so given
may incriminate him, but which also provides that such wit-
ness shall not be subject to prosecution on account of any
transaction, matter, or thing concerning which he may so
testify or produce evidence, is found in the Congressional Globe
of January 23, 1857, p. 434. A bill was pending before the
Senate of the United States to compel witnesses before Con-
gress or its committees, in certain cases, to discover testimony.
The bill provided:

"No person examined and testifying before either house
of Congress, or any committee of either house, shall be held
to answer criminally in any court of justice, or subject to any
penalty or forfeiture for any fact or act touching which he
shall be required to testify."

Senator Hale from New Hampshire opposed the pas-
sage of the bill upon two grounds: First, that the bill was
contrary to the principles of the common law; second, that the
provision exempting a witness from prosecution as to any
transaction or matter with reference to which he might testify
was inadequate, because the law could not protect such wit-
ness from the disgrace and infamy which might result to him
from any disclosures which he might make. To this Senator

Toombs of Georgia replied, first, that there was nothing sacred about the common law, which could not be changed by statute. Mr. Toombs further remarked that the exemption allowed by the common law was that a witness should not be compelled to incriminate himself, and that even at common law a witness might voluntarily incriminate himself. In reply to the argument that while the law might exempt a witness from prosecution on account of any matter to which he might testify, but that the law could not protect such witness from the shame and infamy which might result to him on account of his self-incriminating testimony, Senator Toombs said:

"It was well considered more important that society should be able to punish crime and put down this particular vice than that the individual citizen should have the supposed right of saving his own character. * * * Well, sir, shall society be defeated in punishing the crime that a man may cover his individual infamy? That is the only question which can arise under this bill. Is it better for the commonwealth that the infamous man shall be protected from declaring his own infamy, or that society shall be able to punish the highest crimes against itself? I say if that was the common law (which I deny, and the gentleman's own authority admits it to have been questionable), it is competent for us and for the States to change the common law when it is requisite to do so, in order to reach this class of crimes which are said to be rife. From their very nature they are not discoverable without extraordinary means. Who can give the information except the persons who offer or accept bribes, and the agents who go between them? How is it possible to discover this particular crime unless you compel some of the *participes criminis* to disclose it? I know it is a bad chance, but it is the only chance. * * * If you believe protection for not making public the infamy of the infamous is a higher duty of the Legislature than bringing culprits to punishment, the reasoning of the Senator from New Hampshire is unanswerable, but on no other principle. I hold that our first duty is to society. These are crimes which, from their peculiar nature, are such that we have a right to compel anybody to disclose. Congress has not before legislated upon it; and I would fain

hope that it has been for the same reason that the Romans had no law against fratricide for eight centuries—the crime had never existed. We had no law heretofore—in 70 years of our existence—upon this subject of compelling witnesses to testify; but the remedy must come when the offense comes."

An able and lengthy discussion ensued, in which Senator Toombs was supported by Senator Bayard of Delaware and Senator Seward of New York, and the bill was finally passed and became a law by a vote of 46 to 3. Certainly no well-informed lawyer will deny that Senators Toombs, Bayard, and Seward were among the ablest constitutional lawyers of their day. We are gratified to find that the views which we have so often expressed in our opinions are in harmony with those entertained by these great lawyers and statesmen, for their arguments are pregnant with the spirit of substantial justice, which is the corner stone upon which rests the doctrine of harmless error.

The two sections of the Constitution now under consideration are inseparably connected with each other and relate to the same subject-matter, and must therefore be construed together as though they constituted but one section. The first paragraph provides that "No person shall be compelled to give evidence which will tend to incriminate him." This protects a witness alone from self-incrimination by compulsion. It secures and guarantees to a witness the right or privilege of silence. He may answer or decline to answer a question at his option, when such answer may incriminate him. It in no manner forbids the voluntary giving of incriminatory evidence on the part of a witness. It nowhere says he shall not be permitted to give such incriminatory evidence against him-self. It simply protects a witness against being compelled to testify against himself. It contains no inhibition against voluntary incriminatory evidence on the part of a witness. This is a plain, common-sense interpretation of the language used, and is such as would most naturally suggest itself to the mind of a person of ordinary understanding, and is in

harmony with the well-recognized rule of the common law that confessions or self-accusations obtained by compulsion are never admissible in evidence against a defendant, but that when a defendant has freely and voluntarily and without compulsion confessed to the commission of a crime, such confession is admissible in evidence against him, and constitutes in reason the highest character of proof. It certainly was not the intention, either of the framers of the Constitution or of the people whose votes adopted and placed it in force, to establish the doctrine that voluntary confessions of guilt should not be received in evidence or that when made they should constitute a bar to a criminal prosecution for the crime voluntarily so confessed or testified to. If the purpose and effect of this paragraph is to indelibly place the seal of silence upon the lips of a witness as to all incriminatory evidence against himself under any and all circumstances, then whenever a defendant attempts to testify in his own behalf and gives self-incriminatory evidence, it would be the duty of the court to direct his. acquittal. So it is seen that the construction contended for, that under this provision of our Constitution, if a witness under any circumstances be permitted to give incriminatory evidence against himself, such testimony would amount to a bar to a prosecution against such witness as to the matters testified to, would lead to the most absurd consequences. To say that a person shall not be compelled to do a thing does not mean that he shall not be permitted to do it. It simply means that such action on his part must not be the result of compulsion, but that it may be freely and voluntarily done at the option of such person. But there is an exception to this rule so far as compulsion is concerned. It is as follows:

"Any person having knowledge or possession of facts that tend to establish the guilt of any other person or corporation charged with an offense against the laws of the state, shall not be excused from giving testimony or producing evidence, when legally called upon so to do, on the ground that it may tend to incriminate him under the laws of the state; but no person shall be prosecuted or subjected to any penalty or

forfeiture for or on account of any transaction, matter, or thing concerning which he may so testify or produce evidence."

All of the provisions of our Constitution must be so construed as to make them harmonize with each other and give full force and effect to each provision. Section 18 of the Bill of Rights of the Constitution of Oklahoma vests grand juries with power to investigate and return indictments for all character and grades of crime. Looking to the meaning, purpose, and spirit of the Constitution, we are of the opinion that a grand jury investigation of a crime comes within the purview of the term "charged with an offense," as used in section 27 of the Bill of Rights of the Constitution of Oklahoma. This is the holding of the Supreme Court of the United States in construing a similar statute in the case of *Hale v. Henkle*, 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652. While we do not desire to be understood as assenting to all that is said by the Supreme Court of the United States in that case, yet we do concur in the result reached. It is true that a grand jury has no power to compel a witness to answer questions, but it may refer the question asked to the court, who will decide as to whether or not the witness must answer any given question, and who alone has power to compel obedience.

In the case of *Hale v. Henkle*, above quoted, the court said:

"The scope of the powers of a grand jury is limited by the jurisdiction of the court of which it is an appendage. *United States v. Hill*, 1 Brock. 156 [Fed. Cas. No. 15,364]. It is also subject to the direction of the court and cannot effectually exercise some of its most important functions without the interpretation of the court. It must resort to the court to enforce by subpœna the attendance of witnesses, and it is only through the order of the court that witnesses may be punished for contumacy. *Commonwealth v. Bannon*, 97 Mass. 214; *Heard v. Pierce*, 8 Cush. [Mass.] 338 [54 Am. Dec. 757]. The court may inquire whether the grand jury has exceeded its powers (*People v. Naughton*, 7 Abb. Prac. N. S. [N. Y.] 421, 426; *Denning v. State*, 22 Ark. 131, 132), and may punish the entire jury or any of its members (*Turk*

*v. State,* 7 Ohio, 240, 243, pt. 2; *State v. Cowan,* 1 Head [Tenn.] 280; *Re Ellis,* Hempst. 10 [Fed. Cas. No. 4,399a]). Thus, while the grand jury is an independent body, its independence is confined within well-defined limits."

That brings us to the question of immunity granted by our Constitution to any witness "who shall not be excused," but who has been compelled to "so testify or produce evidence." The meaning of this provision is the pivotal question in this case. Does this provision include all persons who may voluntarily give self-incriminatory evidence, or is it limited to those who have not been excused and have been compelled to so testify or produce evidence?

Counsel for appellant seek to support their contention by citations from federal decisions, none of which have attempted to pass upon or construe the precise question now before us. It is true that the fifth amendment to the Constitution of the United States, among other things, provides that "no person shall be compelled in any criminal case to be a witness against himself," but this provision is limited in its effect to federal courts alone. It has no application whatever to state Constitutions or to state courts.

In the case of *Ex parte Spies,* 123 U. S. 166, 8 Sup. Ct. 24, 31 L. Ed 86, Chief Justice Waite said:

"That the first ten articles of amendment were not intended to limit the powers of the state governments in respect to their own people, but to operate on the national government alone, was decided more than a half century ago, and that decision has been steadily adhered to since. *Baron v. Baltimore,* 32 U. S. (7 Pet.) 243, 247, 8 L. Ed. 672, 674; *Livingston v. Moore* [32 U. S. (7 Pet.)] 469, 552, 8 L. Ed. 751, 781; *Fox v. Ohio,* 46 U. S. (5 How.) 410, 434, 12 Ed. 213, 223; *Smith v. Maryland,* 59 U. S. (18 How.) 71, 76, 15 L. Ed. 269; *Pervear v. Massachusetts,* 72 U. S. (5 Wall.) 475, 479, 18 L. Ed. 606, 609; *Twitchell v. Pennsylvania,* 74 U. S. (7 Wall.) 321, 19 L. Ed. 223, 224; *Justices v. Murray,* 76 U. S. (9 Wall.) 274 [19 L. Ed. 658]; *Walker v. Sauvinet,* 92 U. S. 90, 23 L. Ed. 678; *U. S. v. Cruikshank,* 92, U. S. 542, 552, 23 L. Ed. 588, 591; *Pearson v. Yewdall,* 95 U. S. 294, 296, 24 L. Ed. 436, 437; *Davidson v. New Orleans,* 96 U. S. 97,

101, 24 L. Ed. 616, 618; *Kelly v. Pittsburg,* 104 U. S. 79, 26 L. Ed. 658; *Presser v. Illinois,* 116 U. S. 252, 265 [6 Sup. Ct. 580], 29 L. Ed. 615, 619."

The provisions of our Constitution on the subject of immunity have never been passed upon by the courts of the United States, and indeed we do not see how this could ever be done without entirely changing our dual system of government, because the Constitution of the United States will be searched in vain for any provision which in any manner interferes with or abridges the powers of the states in this respect. It is true that by acts of Congress immunity is granted witnesses who give self-incriminating testimony before either house of Congress, or any committee thereof, or before the Interstate Commerce Commission, or before the Department of Commerce and Labor; but on page 798, 34 U. S. Sts. (U. S. Comp. St. 1901, p. 1319), it is expressly provided that such "immunity shall extend only to a natural person who, in obedience to a subpoena, gives testimony under oath or produces evidence, documentary or otherwise, under oath." The purpose of this statute appears to be to exempt from punishment the officer or agent of a corporation who in obedience to a subpoena gives testimony under oath or produces evidence, documentary or otherwise, as to any matter being inquired into by authority of federal law, and to leave the corporation subject to a fine or forfeiture as the law may direct. Whatever may be thought of the wisdom and justice of this statute, this is a question for Congress alone to settle, for courts are not forums of legislation or arenas for political debate. The federal courts are not therefore so much to be blamed for the decisions which they have rendered on this subject. It would be a useless consumption of time for us to discuss these decisions, for by the express letter of the statute a natural person who in obedience to a subpœna gives testimony under oath in the instances provided for is granted immunity. This statute is responsible for the farcial immunity baths which have been granted to officers or agents

of corporations and monopolies on account of their illegal conduct, while the corporation itself has escaped with a nominal fine. This statute practically renders our anti-trust laws nugatory, because under its provisions officials can escape punishment. A corporation is an artificial or unnatural person, and the corporation itself cannot be imprisoned. If a fine is imposed upon it, it at once proceeds by further extortions to collect the amount paid from its customers. Therefore a judgment against a corporation is in effect a judgment against the public. Thus the evil is not abated and the public continues to suffer. On the other hand, if the guilty officers of a corporation were sent to prison, it might deter them from the commission of illegal acts. We do not wish to speak disrespectfully of the Congress of the United States, but it strikes us that the effect of the laws which it has enacted is to protect rather than punish those who are engaged in conspiracies against the people.

In reply to the federal cases cited by counsel for appellant, it is enough for us to say that we have no such statutes as those upon which these decisions are based, and we truly hope that no such law will ever be enacted in Oklahoma. Persons who enrich themselves at the expense of the people are generally men of high intelligence, and usually exercise great influence, and if it ever becomes the law in Oklahoma that they can escape punishment simply by testifying in obedience to a subpœna to self-incriminating facts, the honest and hard-working people of the state will be largely at their mercy, for they will generally have influence enough, upon first one pretext or another, to be allowed to testify in obedience to a subpœna.

The provisions of the federal law granting immunity are not analogous to the provisions of our Constitution. It is the duty of the federal courts to construe the Constitution of the United States and federal statutes passed in pursuance thereof, and by such construction we are bound. *Titsworth v. State,* 2 Okla. Cr. 268, 101 Pac. 288. Federal courts have no right

to construe a state Constitution or the statutes of a state unless they are in conflict with the Constitution of the United States, or some act of Congress rightfully passed thereunder. It is our right and duty to construe the Constitution and laws of this state, when not in conflict with federal authority, independently of the decisions of any other court. See Cooley on Constitutional Limitations, p. 21. We find nothing in any decision of the federal courts which is in any manner binding upon us as to the question now before us.

Our attention has been directed to the law of Kansas upon the subject of immunity. For the purpose of showing that there is no analogy between the law of Kansas and the provisions of our Constitution we will copy the Kansas statute in full. In chapter 113a under the title of Trusts, on page 1595 of the General Statutes of Kansas, compiled in 1901, we find section 7873, which is as follows:

"The several district courts of this state and the judges thereof shall have jurisdiction, and it shall be their duty, upon good cause shown and upon written application of the county attorney or the Attorney General, to cause to be issued by the clerk of said court subpoenas for such witnesses as may be named in the application of a county attorney or the Attorney General, and to cause the same to be served by the sheriff of the county where such subpœna is issued; and such witnesses shall be compelled to appear before such court or judge at the time and place set forth in the subpoena, and shall be compelled to testify as to any knowledge they may have of the violations of any of the provisions of this act; and any witness who fails or refuses to attend and testify shall be punished as for contempt, as provided by law. Any person subpœnaed and examined shall not be liable to criminal prosecution for any violation of this act about which he may testify. Neither shall the evidence of any such witness be used against him in any criminal proceeding. The evidence of all witnesses so subpœnaed shall be taken down by the reporter of said court, and shall be transcribed and placed in the hands of the county attorney or the Attorney General, and he shall, in the proper courts, at once prosecute such violator or violators of this act as the testimony so taken shall disclose.

Witnesses subpœnaed as provided for in this section shall be compelled to attend from any county in the state."

The Kansas statute is substantially the same as the acts of Congress hereinbefore referred to. It therefore need not be discussed.

Our attention has also been called to the laws of Wisconsin on this subject. In chapter 85, on page 106, Laws of Wisconsin, 1901, we find the following:

"Section 4078. No witness or party in an action brought upon the bond of a public officer, or in an action by the state or any muncipality to recover public money received by or deposited with the defendant, or in any action, proceedings or examination, instituted by or in behalf of the state or any municipality, involving the official conduct of any officer thereof, shall be excused from testifying on the ground that his testimony may expose him to prosecution for any crime, misdemeanor or forfeiture. But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify, or produce evidence, documentary or otherwise, in such action, proceedings or examination, except a prosecution for perjury committed in giving such testimony."

The Wisconsin statute provides that a witness who may testify for the state or for a municipality in proceedings to recover public money received by or deposited with a defendant, or in any action instituted by the state or any municipality involving the official conduct of any officer thereof, shall be granted immunity as to the matter to which he shall testify, except a prosecution for perjury committed in the giving of such testimony. This statute is in many respects different from the provisions of our Constitution, as we will point out when we come to analyze the provisions of our Constitution granting immunity. If any state has a constitutional provison or statute in all respects similar to the Constitution of Oklahoma, our attention has not been called to it, and it has not been discovered in the investigation which we have made.

There being no case directly in point, we are forced to

rely on the evident meaning of the immunity clause of our Constitution, and upon general principles in deciding the question now before us. The language of our Constitution is broad and comprehensive, and covers all persons, whether natural or artificial, and is applicable to all criminal prosecutions without limitation. In other words, the immunity clause is just as broad and no broader than the right or privilege of silence which it invades, and which is contained in section 21 of the Bill of Rights of our Constitution. If there had been no right of silence, there would be no necessity for granting immunity. The two rights preserved in our Constitution are in all respects equal and cannot be logically divorced or distinguished from each other. The object of granting immunity evidently was to assist the state in procuring credible evidence which otherwise could not be secured, and thereby enforcing the law. Its purpose is to suppress crime and to protect society, and it would be a gross perversion of this purpose to so construe this provision as to make it the means of protecting crime and defeating the enforcement of justice. We agree fully with Senator Toombs of Georgia when he declared, in the debate hereinbefore referred to, that "It is more important that society be able to punish crime and put down vice than that the individual citizen should have the supposed right of saving his own character." Senator Toombs also said it would be a monstrous idea that society should be defeated in punishing crime in order that a man might cover up his individual infamy. He asked the pertinent question as to whether or not "protection from making public the infamy of the infamous is a higher duty than bringing culprits to punishment." Here is where the viewpoint of the court is of the utmost importance. This court is, unequivocally of the opinion that criminal laws are enacted and courts are established solely and exclusively for the purpose of suppressing crime, and thereby protecting society, and it is from this viewpoint that we construe all statutes and constitutional

provisions. We are therefore of the opinion that before any witness is entitled to immunity under the provisions of our Constitution on account of self-incriminatory testimony which he may have given, such person must comply fully with the spirit of all of the provisions which the Constitution contains on this subject. The privilege of silence is one which may be waived, and which is waived if objection is not made in apt time. If a witness answers questions in such a manner as to incriminate himself he should not be granted immunity unless, in the language of the Constitution, he has been "compelled to give evidence" which incriminates him and has "so testified." But it may be suggested that a witness may testify without having knowledge of his legal rights in the premises. As a matter of first impression, and viewing this question alone from the standpoint of an individual defendant, it does appear to be unjust to hold that a defendant can waive a right of which he has no knowledge, and that common fairness would require that before a defendant could waive this right he should be informed by the officers of its existence. A little reflection, however, will show that this is an exceedingly narrow and superficial view which is inconsistent with the principles of the law and contrary to the highest considerations of public policy. It would be exceedingly unjust to the state and to society, for whose protection laws are enacted and courts are established, to hold that the action of the county attorney or a member of the grand jury, in inadvertently asking an improper question or, through ignorance or otherwise, neglecting to advise a witness of his rights, should operate as an acquittal of one guilty of crime, when as a matter of law and fact an acquittal of crime cannot be rendered except in a court of competent jurisdiction, after the evidence has all been heard and the jury have had the legal questions involved submitted to them by the judge. It was upon this broad theory that Senator Toombs well said that it is more important that society should be able to punish crime and put down vice than that the individual citizen should have the

supposed right of saving his own character, or that infamous men should be protected from declaring their own infamy. It is a principle of the common law, and also a matter of statute, that every person is presumed to be innocent of crime until his guilt is established by competent evidence beyond a reasonable doubt. There is therefore no presumption of law that a witness in any given case has a guilty connection with a crime under inquiry. On the contrary, the presumption is that each witness is innocent and truthful. It would be contrary to this presumption, an insult to a witness, and a parody on reason and justice to require that before a witness is examined touching any crime under inquiry the witness should first be cautioned against the danger of self-incrimination. That ignorance of law is no excuse, and that every person is presumed to know the law, are principles as old as the common law itself. They are founded on necessity, supported by reason, and are in harmony with justice. But for the existence of these two principles the enforcement of criminal law would be impossible, and courts would become a farce. This is not only the common law, but it is settled beyond the possibility of debate by the express and direct language of the statute, which declares: "The defendant shall be conclusively presumed to know matters of record." See section 5780, Rev. Laws 1910. The Constitution and statutes of Oklahoma are matters of record, which the courts are required to hold that all persons are conclusively presumed to know, and of which they must take notice at their peril. To hold otherwise would be to ignore and refuse to be bound by the statute above quoted.

The idea which we are now combating is based upon false premises. There is no provision of the common law or of our Constitution, or of our statutes, which protects a witness against being asked incriminating questions. The protection granted is that a witness shall not be compelled to answer such questions except under certain circumstances. The impropriety consists, not in asking such questions, but

in compelling replies thereto against the option of the witness. A witness cannot voluntarily answer such questions and at the same time claim the immunity granted. It cannot be logically said that a right can be waived and asserted by the same act. In other words, compulsion is a condition precedent for immunity. But this is not all. The testimony which he has been compelled to give must be truthful. If he testifies falsely and misleads and deceives the tribunal before whom he is giving his evidence, it would be exceedingly unjust for the state to grant him immunity. The very purpose of the immunity clause of the Constitution is to enable the state to get at the truth, and if a witness willfully suppresses the truth, he has not brought himself within the spirit of the provision of the Constitution, and he should not be granted immunity. If immunity were granted on these conditions, then it would rest upon falsehood and fraud, and not upon truth and justice, and the state would be absolutely without redress where the witness testified falsely and practiced deceit upon the tribunal before whom he was testifying. Under the terms of our Constitution, if we were to follow the rule established by other courts, a prosecution for perjury would not lie under such circumstances, because it declares that "no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may so testify or produce evidence." In this respect our immunity clause differs from the statute of Wisconsin, which reserves the right of prosecution for perjury committed in the giving of such testimony. Touching this reservation the Supreme Court of Wisconsin, in the case of *State v. Murphy,* 128 Wis. 201, 107 N. W. 470, in discussing the question as to whether or not under this statute a witness could only secure immunity when he had testified to the truth, said:

"The statute itself, however, refutes any such meaning, for it expressly reserves the right to prosecute for perjury 'in giving such testimony.'"

The same reservation is contained in the acts of Congress granting immunity. See 3 United States Comp. St. 1901, p. 3173 (Act Feb. 11, 1893, c. 83, 27 Stat. at L. 443). If Congress had thought that a person who testified falsely in answer to questions of an incriminating character would be subject to prosecution for perjury, why the necessity for this reservation? We have no such reservation in our constitutional provisions; and, as before said, if we should follow the precedents, when the witness does not speak the truth, the state would be left without redress, although the witness had violated the purpose and spirit of the Constitution. We cannot believe that it was the purpose of the intelligent and justice-loving people of Oklahoma, when they voted for and adopted the Constitution, to grant immunity to any man based upon a lie, or in other words, that they intended that the commission of perjury should atone for an offense already committed. It is a familiar rule of common law, common sense, and common justice that a legal right cannot be based upon fraud. We therefore hold that the witness who claims immunity on account of self-incriminatory testimony which he had been compelled to give must act in good faith with the state, and must make truthful replies to the questions which are propounded to him, and which he has been compelled to answer, and that any material concealment or suppression of the truth on his part will deprive him of the immunity provided by the Constitution; and the witness must testify to something which, if true, would tend to criminate him. This immunity is only granted to those who earn it by testifying in good faith. In our judgment any other construction would be an insult to and a libel upon the intelligence of the people of Oklahoma, an outrage on law, and a prostitution of justice.

Another consideration which has had great weight with us in arriving at this conclusion is that accomplice testimony is at best contrary to natural justice, and is odious to all right-thinking people. It confessedly comes from a corrupt source. It has the taint of treachery upon it, and the brand of in-

famy is indelibly stamped upon its very forehead. It is but seldom, if ever, that an accomplice betrays his associates in crime from a pure and disinterested motive. Such testimony is usually prompted by the most unworthy, sordid, selfish motives, and wherever an accomplice testifies against his associates in crime, it invariably results in bringing bitter enmity and hatred among them, which is another incentive to the commission of perjury. Therefore it is the duty of the courts to remove as far as possible all inducements for, and thereby minimize the commission of, perjury upon the part of such witnesses, and to throw every possible safeguard around their testimony. It is well known to all judges and lawyers of experience that guilty criminals often falsely accuse, not only their associates in crime, but also innocent persons, and invent false testimony against them in order that they may thereby gain immunity. The case was never tried in which the state used the testimony of an accomplice in which the lawyers for the defense, if they knew their business and were loyal to their clients, have not presented these considerations to the jury, and this is often done with great justice and telling effect. Now, if this court establishes the doctrine that a witness cannot gain immunity unless he testifies to the truth, and nothing but the truth, and makes a complete disclosure of all material facts within his knowledge touching the matter under inquiry, and that if such witness willfully testifies falsely as to any material matter, or if such witness willfully conceals any material fact within his knowledge, then he will not secure immunity, but will be subject to trial and conviction, and that his own testimony may be used against him, this will constitute the strongest safeguard which we can throw around such testimony. We believe that this is the spirit and purpose of the constitutional provision under discussion, that it is the plain import of the language of the Constitution to persons of ordinary understanding, and that this was the intention of the people when they voted for and adopted the Constitution; and we think

it is clearly our duty to so hold. This rule will not only go far toward the prevention of perjury by such witnesses, but it will also enable courts and juries to have some confidence in testimony so given. Any other rule would make the use of accomplice testimony a disgrace to the state of Oklahoma, dangerous to justice, and a stench in the nostrils of all honest people. This court has no premiums to offer for the commission of perjury.

With this explanation of the meaning, purpose, intent, and spirit of the immunity clause of our Constitution, we will now consider the legal questions involved. That the right of silence and the privilege of immunity may be waived has, in substance, been repeatedly decided by this court.

In the case of *Starr v. State*, 5 Okla. Cr. 440, 115 Pac. 356, Judge Doyle, speaking for the court, said:

"Where a constitutional right in a criminal cause is largely for the benefit of the accused or in the nature of a personal privilege, the law is well settled that an accused may waive such right."

In the case of *State v. Frisbee*, 8 Okla. Cr. 406, 127 Pac. 1091, this court held that a defendant in a criminal case may waive any right not inalienable, given him by the statute or by the Constitution, where it can be relinquished without affecting the rights of others, and without detriment to the community at large, and that such waiver may be made either by express agreement or conduct, or by a failure to insist upon such right in seasonable time.

Referring to the right of silence, the Supreme Court of the United States in the case of *Brown v. Walker*, 161 U. S. 591, 16 Sup. Ct. 644, 40 L. Ed. 819, said:

"(1) Thus, if the witness himself elects to waive his privilege, as he may doubtless do, since the privilege is for his protection and not for that of other parties, and discloses his criminal connections, he is not permitted to stop, but must go on and make a full disclosure. 1 Greenl. Ev. sec. 451; *Dixon v. Vale*, 1 C. & P. 278; *East v. Chapman*, 2 C. & C. 570; s. c., M. & M. 47; *State v. K——*, 4 N. H.

562; *Low v. Mitchell,* 18 Me. 372; *Coburn v. Odell,* 10 Fost. (30 N. H.) 540; *Norfolk v. Gaylord,* 28 Conn. 309; *Austin v. Pointer,* 1 Sim. 358; *Commonwealth v. Pratt,* 126 Mass. 462; *Chamberlain v. Wilson,* 12 Vt. 491 [36 Am. Dec. 356]; *Lockelt v. State,* 63 Ala. 5; *People v. Freshour,* 55 Cal. 375."

In the case of *Burrell v. Montana,* 194 U. S. 572, 24 Sup. Ct. 787, 48 L. Ed. 1122, the Supreme Court of the United States further said:

"The statute does not prohibit the use of testimony against the consent of him who gave it. It prescribes a rule of competency of evidence which may or may not be insisted upon. It does not declare a policy the protection of which cannot be waived. And the time to avail of it is when the testimony is offered."

Mr. Wigmore, in his great work on Evidence (volume 4, p. 3101) in speaking of the privilege of silence, says:

"In preserving the privilege, however, we must resolve not to give it more than its due significance. We are to respect it rationally for its merits, not worship it blindly as a fetish. We are not merely to emphasize its benefits, but also to concede its shortcomings and guard against its abuses."

On page 3132, same volume, he again says:

"The privilege is merely an option of refusal, not a prohibition of inquiry. Hence, when an *ordinary witness* is on the stand, and a criminating fact relevant to the issue is desired to be proved through him, the question may be asked, and it is for him then to say whether he will exercise the option given him by the law. It cannot be known beforehand whether he will refuse."

On page 3150, same volume, he again says:

"It has never been doubted that the privilege is in itself waivable."

On page 3151, same volume, he again says:

"The case of the ordinary witness can hardly present any doubt. He may waive his privilege; this is conceded. He waives it by exercising his option of answering; this is conceded."

These are admirable statements of the principle involved

and take this question out of the fog in which it has been obscured by some of the discussion of appellate courts.

In the case of *State v. Duncan*, 78 Vt. 364, 63 Atl. 225, 4 L. R. A. (N. S.) 1144, 112 Am. St. Rep. 922, 6 Ann. Cas. 602, in discussing this question the Supreme Court of Vermont said:

"Our Constitution declares that no one can be compelled to give criminating evidence against himself. Such is the common law. *Nemo tenetur seipsum accusare*. It is objected that the plea is bad, because it does not show the prisoner was compelled to give criminating evidence against himself. This immunity is a personal privilege, and may be waived, and is waived if not seasonably asserted, and the testimony regarded as voluntary. *Chamberlain v. Willson*, 12 Vt. 491, 36 Am. Dec. 356. The plea does not show that the prisoner asserted his privilege. It alleges that he involuntarily testified. But that is subjective, signifying only his mental state, and means no more than unwillingly and reluctantly, and does not imply a disclosure of that mental state by objecting to answer nor otherwise; and until such disclosure was made in some way there could have been no compulsion. True, the plea alleges compulsion; but that is only a conclusion, and is not warranted by the facts alleged. In *People v. Louder*, 82 Mich. 109, 46 N. W. 956, the prisoner, who was indicted for bribery, pleaded in abatement that he appeared before the grand jury in obedience to a subpœna, and, being ignorant of the fact that charges of bribery against him were being inquired into, and without counsel or being advised in the premises, he was required and compelled to, and did, give his testimony, and was fully interrogated as to said charges, and testified to facts material and necessary to prove their truth and to sustain the indictment, and that upon his testimony and that of other witnesses the indictment was found. The court said that being subpœnaed and appearing before the grand jury was not a violation of the prisoner's constitutional rights, nor being sworn before that body, nor testifying upon any matter that did not criminate him, for the law compelled him to do all that under pains and penalties, but that it did not compel him to criminate himself, and that in all cases where a personal privilege exists for a witness to testify or not, and he testifies without objection, he

will be deemed to have done so voluntarily. The court went on to say that the prisoner did not say in his plea that he claimed his privilege, or refused to answer any question, that he averred that he was required and compelled to and did make answer to the questions put to him, but. that that was a conclusion from the facts, whereas the rules of pleading in abatement required him to set forth the facts, and not his conclusions. * * * *State v. Comer,* 157 Ind. 611,. 62 N. E. 452, is practically like the Michigan case. There the prisoner was indicted for selling his vote in violation of the statute. He pleaded in abatement that, for the purpose of obtaining evidence and securing an indictment against him, the grand jury caused him to be summoned before them to answer such questions as might be propounded to him; that he appeared, and was sworn, and while under oath was interrogated by the grand jury, and by them then and there compelled, forced, and caused involuntarily to testify to matters and facts concerning said crime; that he was not then and there informed by any one, and did not know that he had the legal right to refuse to testify or give to the grand jury any evidence concerning his supposed connection with or commission of said crime, whereof the grand jury suspected him guilty; that if he had had such information and knowledge, he would not have testified about such facts, nor given the grand jury any evidence in relation thereto; and that the indictment was returned upon the testimony so given by him. The court said that being summoned and appearing before the grand jury and being sworn was not a violation of the prisoner's constitutional rights, and while before the grand jury he could be compelled to testify to any matter that would not criminate him, but could not be compelled to testify to any matter that would criminate him, and could claim his privilege or not, as he chose, but, if he gave criminating evidence voluntarily, his constitutional rights were not thereby violated, for it is a general rule that when a personal privilege exists for a witness to testify or not as he chooses, and he testifies without objection, he will be deemed to have done so voluntarily; that the allegation of the plea that the grand jury compelled and forced the prisoner involuntarily to testify to facts criminating himself was a mere conclusion, whereas facts, and not conclusions, should have been alleged; that the grand jury could not have compelled

him, but only the court, and that the plea did not show compulsion; that as to the allegation that the prisoner was not informed, and did not know, of his right to refuse to testify, the statute did not require the grand jury to give him such information; that everybody is presumed to know the law, and that the grand jury had a right to act upon the presumption that the prisoner knew his rights in the premises; that he was not in custody nor under bonds to answer to a charge of selling his vote, and no such charge was pending against him. The line is definitely drawn in New York between cases in which the testimony of a witness can be used against him and those in which it cannot be. Thus, when a witness is called and sworn before a coroner's jury before it has been ascertained that a crime has been committed, or before any one has been arrested charged with the crime, the testimony of that witness, should he afterwards be charged with the crime, may be used against him on his trial; and the mere fact that at the time of his examination he was aware that a crime was suspected, and that he was suspected of being the criminal, will not prevent his being regarded as a mere witness whose testimony may be given in evidence. * * * The privilege is an option of refusal, not a prohibition of inquiry. Hence, when an ordinary witness is on the stand, and a self-incriminating act relevant to the issue is desired to be shown by him, the question may be asked, and then it is for the witness to say whether he will answer it or claim his privilege, for it cannot be known beforehand which he will do. 3 Wigmore, Ev. sec. 2268; Rapalje, Witnesses, Sec. 265; *Short v. State,* 4 Har. (Del.) 568. A witness must obey a subpœna, and be sworn. Then he may claim his privilege. *Eckstein's Petition,* 148 Pa. 509, 24 Atl. 63; *United States v. Kimball* (C. C.) 117 Fed. 156, 163; *Boyle v. Wiseman,* 10 Exch. 647."

If this were an open question there is another consideration which would have great weight with us in its determination. Where a crime has been committed and its perpetrators are unknown, if the state assumes the risk of granting immunity to any witness, whether suspected or not, who may be examined before a grand jury touching the matter, even although such witness may not claim the privilege of silence,

it would be impossible to make anything like a thorough investigation of such cases, and many crimes would go undiscovered and unpunished. While it is true that grand juries investigate all kinds of crimes; yet it was the necessity of investigation of such cases as this that caused the Constitutional Convention to retain the grand jury system. See *Hartgraves v. State,* 5 Okla. Cr. 266, •114 Pac. 343, 33 L. R. A. (N. S.) 568, Ann. Cas. 1912D, 180. If we were to sustain the contention of counsel for appellant, we would practically defeat the very object had in view by the Constitution in providing for grand jury investigations. It would also be unjust to innocent parties who might be suspected of crimes committed, because a grand jury would not dare to place such suspected parties upon the witness stand for fear that subsequent developments might prove them guilty, whereas if all persons who are supposed to have any knowledge of the commission of crimes may be placed upon the witness stand and questioned as to facts within their knowledge, it would give innocent persons an opportunity to vindicate themselves, and the truth could be discovered. Courts should never forget that the discovery of the truth, the enforcement of justice, the protection of the innocent, and the punishment of the guilty are the only purposes which the law has in view, and all laws should be so construed as to promote the accomplishment of these results. The immunity granted by our Constitution for giving incriminating testimony logically cannot be broader than the privilege of silence which it invades. It is intended to afford a remedy for an existing evil. To make it broader than the evil at which it was aimed would make the remedy more injurious to the cause of justice and the interests of society than the original cause of complaint which it was enacted to cure. Had there been no privilege of silence there would have been no necessity for granting immunity. It therefore follows that a waiver of the privilege of silence is also a waiver of the immunity granted for giving incriminat-

ing testimony. The witness must claim the first if he would enjoy the latter. Reason and justice both dictate that the state should have notice as to the consequence which will result from compelling a witness to answer questions which may tend to incriminate him, and then the state will proceed at its peril and the witness will be protected.

A grand jury has no power to grant any witness immunity on account of testimony given before that body. Neither has it the power to compel a witness to answer an incriminating question, and any action of a grand jury will not be binding and valid, and will not operate to grant a witness immunity, unless it meets with the approval of the court and the prosecuting attorney.

The case of *Moseley v. State*, 35 Tex. Cr. R. 210, 32 S. W. 1042, presents a case in which a defendant claimed immunity upon the ground that he had a contract with the sheriff of Hill county, upon which the defendant had furnished certain information which had resulted in the recovery of stolen property and the conviction of a number of thieves, for which information the defendant had been promised immunity by the sheriff of said county. The court declared that the defendant was not entitled to immunity on account of this contract, upon the ground that the sheriff had no authority to make any such contract; that such contracts could only be made by officers legally authorized by law so to do. The only officers in Oklahoma who may grant immunity by any action of theirs are the county attorney with the concurrence of the court.

No court has been a greater stickler for the technical rights of a defendant, nor has defended them with more signal ability, than the Court of Criminal Appeals of Texas. We therefore feel that when we agree to any decision which it has rendered there is no danger of our doing the least wrong or injustice to a defendant. Texas has no statute or constitutional provision authorizing the courts to compel witnesses to answer in-

criminating questions and granting immunity to such witnesses on account of such testimony. But it is a principle of the common law, recognized and enforced among all English-speaking people, that where a witness desires to turn state's evidence and testify against others as to the commission of crimes in which such witness is also implicated, and he is permitted to do so upon an agreement with the prosecuting attorney approved by the court, such testimony when so given will secure immunity to such witness. This is based upon the principle that there is no law which forbids or prohibits a witness from voluntarily incriminating himself, and that the interests of justice are often subserved when the courts grant immunity to such witnesses in order that they may secure their testimony, and thereby obtain convictions which otherwise could not be had. This is the law of Oklahoma to-day, independent of and in no manner conflicting or interfering with our constitutional provisions. While the law looks with disfavor upon the testimony of an accomplice, and requires its corroboration before allowing a conviction to stand, based upon such testimony, yet on the other hand the recognition of this principle by the courts tends to prevent extensive agreements between atrocious criminals and makes them perpetually suspicious of each other and, thereby tends to demoralize them in criminal enterprises.

Mr. Greenleaf, in the first volume of his work on Evidence (section 363) says:

"The admission of accomplices as witnesses for the government is justified by the necessity of the case; it being often impossible to bring the principal offenders to justice without them. * * * But whether an accomplice, already charged with crime by indictment, shall be admitted as a witness for the government or not is determined by the judges in their discretion, as may best serve the purpose of justice. If he appears to have been a principal offender he will be rejected. And if an accomplice, having made a private confession upon a promise of pardon made by the Attorney General, should afterwards refuse to testify, he may be convicted upon the evidence of that confession."

-Acting upon this principle the Court of Criminal Appeals of Texas in the case of *Bowden v. State,* 1 Tex. App. 144, said:

"And it seems to have become a practice, recognized as correct, in our own courts for the district attorney, with the concurrence of the court, to enter a *nolle prosequi* in cases where it was deemed essential to the ends of justice that one or more of the defendants, by his consent or at his instance, should turn state's evidence against his codefendants. *Garrett v. State,* 41 Tex. 530; *Barrara v. State,* 42 Tex. 260; *Williams and Smith v. State,* 42 Tex. 392; *Wright v. State,* 43 Tex. 170; *McWilliams v. State* (Tyler, Nov. 26, 1875) [44 Tex. 116]."

In the later case of *Tullis v. State,* 41 Tex. Cr. R. 87, 52 S. W. 83, the same court held:

"Whether a party already charged by indictment shall be admitted upon agreement as a witness for the state against his codefendant, in consideration of his immunity from prosecution, is to be determined by the trial judge in his discretion; and, if such contract has been made, it is not binding upon the state unless it has the approval of the trial judge. Without such approval, the agreement will not constitute a good plea in bar to the prosecution. While a contract of agreement to turn state's evidence, made · with the prosecuting officer, should be made with the consent of the court, yet, where it has been made without the consent of the court, and defendant has acted in perfect good faith, it should be recognized by the court. But if such agreement is made by the prosecuting officer not only without, but against, the consent and over the objections of the court, it is of no validity and should not be enforced."

The same court also said that to hold otherwise "would authorize the state's counsel to make agreements without the consent of the court, and in turn force the court to dismiss the prosecution by reason of the naked agreement so made." The court also cites a long list of authorities in support of this doctrine. This position meets with our entire approval. Immunity should only be granted when the ends of justice will be subserved thereby; and, while prosecuting attorneys may make agreements, yet this matter should always be subject to the

discretion and approval of the court. This is the rule we intend to enforce in Oklahoma.

Sections 6099, 6100, and 6101, Rev. Laws 1910, are as follows:

"Sec. 6099. Order of Dismissal to Show Reasons. The court may either of its own motion or upon the application of the county attorney, and the furtherance of justice, order an action or indictment to be dismissed; but in that case the reasons of the dismissal must be set forth in the order, which must be entered upon the minutes.

"Sec. 6100. *Nolle Prosequi* Abolished. The entry of a *nolle prosequi* is abolished, and the county attorney cannot discontinue or abandon a prosecution for a public offense, except as provided in the last section.

"Sec. 6101. Dismissal Not a Bar to Another Prosecution. An order for the dismissal of the action, as provided in this article, is not a bar to any other prosecutions for the same offense."

These laws were enacted by the Legislature in 1890, and were construed by the unanimous opinion of this court in the case of *Ex parte Warford,* 3 Okla. Cr. 381, 106 Pac. 559. This court there said:

"It is urged on part of the petitioner that his imprisonment is illegal for two reasons: First, the officials of the territory of Oklahoma having taken cognizance of the offense and discharged the petitioner from custody on the payment of the costs of the prosecution and the reimbursement of the person injured by the forgery, this constituted a bar to further prosecution; second, the offense having been committed prior to statehood, and under the law of the territory of Oklahoma, the state courts could acquire no jurisdiction of the offense.

"Sections 7050, 7051, and 7052, Comp. Laws, (Sections 6099, 6100, 6101, Rev. Laws), are as follows:

" 'The court may either of its own motion or upon the application of the district attorney, and in furtherance of justice, order an action or indictment to be dismissed; but in that case the reasons of the dismissal must be set forth in the order, which must be entered upon the minutes.

" 'The entry of a *nolle prosequi* is abolished, and the district

attorney cannot discontinue or abandon a prosecution for a public offense, except as provided in the last section.

"'An order for the dismissal of the action, as provided in this chapter, is not a bar to any other prosecution for the same offense.'

"There is no contention made here that this defendant was in jeopardy, and under the plain letter of these sections of the statutes the dismissal was no bar to a further prosecution for the same offense. Certainly the reimbursement of the person injured by the forgery would not be a bar to a further prosecution. His offense was against public society, and not against the individual whose name he forged. The agreed statement of facts also discloses that the agreement to dismiss the case was had without the knowledge or notice to the prosecuting witness. But it would be immaterial whether he had such notice. This is not such an offense as could be compromised for a money consideration."

If a county attorney cannot discontinue or abandon a prosecution for a public offense, except with the consent and approval of the court, and if a case can be renewed, and if such dismissal, though made with the approval of the court, does not bar another prosecution for the same offense, with what show of reason can it be said that a county attorney or any inferior tribunal can grant a defendant immunity and absolutely bar a court of competent jurisdiction from prosecuting and punishing a criminal? Such a construction would enable a county attorney, or a justice of the peace, or a county judge, to absolutely bind the district court and conclude its action, which would often result in the defeat of justice. One illustration will demonstrate this: Suppose A. and B. engage in a mutual combat in which each tries to kill the other. Suppose they are both arrested and have an examining trial before a committing magistrate, and such committing magistrate requires A. to testify against B. and then requires B. to testify against A. If such action is legal, then both A. and B. would secure immunity. This would reduce the law to an absurdity and defeat the very purpose which was had in view when it was

adopted. But it may be said that if a justice of the peace has the right to hold an examining court he also has the right to enforce the attendance of witnesses and compel answers to questions. Within reasonable bounds this is true. But if a justice of the peace permits illegal questions to be asked a witness, and attempts to force answers to them and commits the witness for contempt for refusing to answer such questions, the remedy of the witness is by *habeas corpus*. See *Ex parte Gudenoge,* 2 Okla. Cr. 110, 100 Pac. 39. But if a witness answers illegal questions, and such answers are not voluntary, this would not grant the witness immunity, and such evidence could not be used against him in any other proceeding because it would not be a voluntary statement freely made.

While a justice of the peace, if there is no evidence against a party charged with murder from which it appears that he is probably guilty, may discharge the defendant, certainly no one will contend that a justice of the peace can enter any order which would amount to an acquittal of a defendant charged with murder and prevent his subsequent prosecution. If he cannot do this directly, but if a witness be allowed immunity on account of being compelled to answer questions in a justice court which may incriminate him, and on account of such answers receives immunity, it would be permitting a justice of the peace to do indirectly that which he cannot do directly. This would be an absurdity upon its face. There is no logical escape from the conclusion that under our constitutional provisions and our statutes immunity can only be secured by the action of a court having jurisdiction to finally try the matters with reference to which the immunity is claimed. In a trial before a justice of the peace he may compel a witness to answer questions which would incriminate such witness as to any matter within the jurisdiction of the justice of the peace for final trial, but beyond this he cannot go. If he could, he would have power to bind the county court, the superior court, the district court, and this court. In states in which a county attorney may enter a *nolle*

*prosequi* without the consent of the court he may grant immunity by contract without the approval of the court, but he cannot do so in this state. Under our system immunity is a judicial question which must be passed upon and decided alone by the court having jurisdiction to finally try the matters involved in the immunity claimed. If a witness has secured immunity by answering incriminating questions upon the order of a court of competent jurisdiction, or if a witness has an agreement with the prosecuting attorney approved by such a court, then this court will see that he is protected in his rights; but this court is not going to permit the doctrine of immunity to be used as an avenue of escape to guilty men or as a cloak of protection for criminals.

We desire to emphasize the principle contained in the decision of the Court of Criminal Appeals of Texas in the case of *Heinzman v. State,* 34 Tex. Cr. R. 76, 29 S. W. 156, 482. In this case the appellant had filed a plea in abatement upon the ground that she had a legal contract in which she was to become a witness for the state in a case pending against Maggie Toomey, in which said Maggie Toomey was charged with murder, and that she had so testified for the state. The court overruled this plea in abatement upon the ground, among others, that the defendant had committed perjury in the Toomey case. The Court of Criminal Appeals approved the action of the trial court in denying the plea in abatement, saying: "If the testimony of a witness is corrupt, he is entitled to nothing by such agreement." This is in harmony with the views hereinbefore expressed by this court, that before a witness can claim immunity on account of his testimony he must act in good faith with the state and must tell the truth. This rule does not do an injustice to any one. At best the testimony of an accomplice is looked upon with grave suspicion and distrust by juries, and the lawyers for the defense always argue that the accomplice is swearing a lie as the price of his liberty, and is trying to convict the defendant against whom he testi-

fies in order that he, the accomplice, may go free. To allow such a witness immunity when he has testified falsely would be to encourage and place a premium upon perjury. But the doctrine established in Texas, and which we intend to see enforced in Oklahoma, is that if a witness willfully swears falsely, immunity shall not be extended to him. This court will never recognize any alleged right founded upon perjury. When this is understood all inducements upon the part of an accomplice to swear falsely will be taken away, and courts and juries will be able to depend with more confidence upon their testimony, because, if it is proven that such a witness has sworn falsely, he will be subject to trial and conviction upon his own testimony. This is the best possible guaranty we can give against the commission of perjury upon the part of accomplices, for when they know that falsehood can do them no good they will be disposed to consult their own interests by telling the truth, and nothing but the truth.

How shall the plea of immunity be interposed, and by whom shall it be decided? It cannot be presented by demurrer, because this plea is not based upon any real or supposed deficiency in the indictment or information. There is no provision of our law which authorizes the submission of this plea to a jury.

Section 5800, Rev. Laws 1910, is as follows:

"Pleas, Classified. There are three kinds of pleas to an indictment or information. A plea of: First, Guilty. Second. Not guilty. Third. A former judgment of conviction or acquittal of the offense charged, which must be specially pleaded, either with or without the plea of not guilty."

This is a limitation upon the issues which may be submitted to a jury. The defense of insanity, or of an alibi, or any other plea which involves the guilt or innocence of a defendant, and to which the doctrine of reasonable doubt is applicable, is included in and should be presented under a plea of not guilty. The only exception to this rule is found in the third clause of the statute prescribing what issues may be submitted to a jury,

and that is, a former judgment of conviction or acquittal must be so submitted. This is an arbitrary provision of the statute, and is not open for discussion. Yet it has always been held that a plea of former jeopardy, when it does not state facts which constitute a defense, should not be submitted to the jury, but should be stricken. from the record by the court. See *Johnson v. State,* 1 Okla. Cr. 321, 97 Pac. 1059, 18 Ann. Cas. 300; *Morris v. Territory,* 1 Okla. Cr. 617, 99 Pac. 760, 101 Pac. 111; *Havill v. United States,* 5 Okla. Cr. 334, 115 Pac. 119; *Hamlin v. State,* 8 Okla. Cr. 187, 126 Pac. 704; *Kent v. State,* 8 Okla. Cr. 188, 126 Pac. 1040.

In the case of *Petitti v. State,* 3 Okla. Cr. 587, 107 Pac. 954, in an opinion by Judge Owen, it was declared that a plea of former acquittal, which was not entered as directed by statute, could not be considered by the court and would not avail.

In the case of *Loyd v. State,* 6 Okla. Cr. 76, 116 Pac. 959, the court said:

"Where a plea of former jeopardy has been filed and does not involve a disputed question of fact, but merely presents a question of law for the determination of the court, it is not necessary to submit such plea to the consideration of the jury but the court should pass upon the question of law presented, and either sustain the plea and discharge the defendant, or overrule the plea and place the defendant upon trial upon the merits of said cause."

With the single exception provided for in the statute with reference to a plea of former acquittal or conviction, nothing should be submitted to a jury unless it throws some light upon the guilt of the defendant. This is the issue which the jury is impaneled to try, and which they must decide against the defendant beyond a reasonable doubt or he must be acquitted. Juries pass upon the question of the guilt or innocence of a defendant under the law as given in the instructions of the court. Rare instances arise such as where the materiality of evidence depends upon disputed facts, and in such cases the materiality of such testimony becomes a mixed question of law

and fact, and may be submitted to the jury under proper instructions from the court. See *Coleman v. State,* 6 Okla. Cr. 252, 118 Pac. 594. But these instances are rare, and do not constitute an exception to the rule, because they go directly to the question of the guilt or innocence of the defendant and may be considered by the jury in determining whether or not a crime has been committed. With the single exception provided for in the statute, issues before a jury are: First, has a crime been committed; second, is the defendant guilty of the crime committed? Any other issue is calculated to confuse and mislead a jury, and should not be submitted to them unless expressly required by statute.

Section 20 of the Bill of Rights of the Constitution of Oklahoma, among other things, is as follows:

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed."

This is not a new provision of law. It is simply declaratory of the common law on this subject, and its meaning is well understood. It only gives a defendant the right of trial by jury upon the issue of his guilt or innocence. The plea of immunity is not involved in the issue of guilt or innocence. In fact it is practically a confession of guilt, and a claim of exemption from any trial at all. It sets up reasons why a defendant should not be required either to demur or plead to an indictment or information. Its purpose is to bar the state from placing the defendant upon trial for the crime charged. The submission of a plea of immunity to a jury is not only unauthorized by statute, but it is contrary to the entire philosophy of the law. Our Constitution provides that no person shall be prosecuted for a felony by information without having first had a preliminary examination before an examining magistrate, or having waived such preliminary examination. See section 17 of the Bill of Rights of the Constitution of Oklahoma.

Section 18 provides:

"A grand jury shall be composed of twelve men, any nine of whom concurring may find an indictment or true bill."

Suppose a defendant is prosecuted for a felony by information without first having had a preliminary examination before an examining magistrate, or having waived such preliminary examination, or suppose a defendant is indicted by a grand jury composed of either more or less than 12 men, or that nine members of the grand jury had not concurred in finding said bill, could either of these defects or objections be taken advantage of by a demurrer or under a plea of not guilty, and should they be submitted to the jury. Each of them would involve issues of fact, but neither of them would go to the question of the guilt or innocence of the defendant. Who will say that these are issues for a jury? Such a proposition is not involved either in the letter or spirit of our Constitution, and its recognition would only result in needless expense and delay. Immunity cannot be presented either by demurrer or under the plea of not guilty. It can only be presented by a plea in bar in support of a motion addressed to the court to set aside the indictment or information and discharging the defendant, upon the ground that he has atoned for the crime committed and is not subject to be indicted or prosecuted for the offense charged.

This question is settled by our statute. Section 5779, Rev. Laws 1910, is as follows:

"If the defendant do not require time, as provided in the last section, or if he do, then on the next day, or at such further day as the court may have allowed him, he may, in answer to the arraignment, either move the court to set aside the indictment or information or may demur or plead thereto."

Subsequent provisions of the statute enumerate a number of conditions under which an indictment or information must be set aside by the court, but these are not exclusive of the grounds upon which this may be done. If a defendant fails to file a motion to set aside an indictment or information upon the ground of immunity under our statute, he is precluded from afterwards presenting this objection, unless the facts upon which

it is based arise after he has demurred or pleaded to the indictment or information.

If any additional argument is necessary in support of the conclusion at which we have arrived, it is found in the language of the Constitution itself, which in mandatory terms declares that "no person shall be prosecuted * * * for or on account of any transaction, matter, or thing concerning which he may so testify." If a witness has earned immunity, his further prosecution is in violation of this provision of the Constitution. Upon a plea of immunity but one question is at issue, and that is as to whether or not the circumstances of the case bring it within the terms of the Constitution. If they do, the court has no option, but must set aside the indictment or information, abate the prosecution, and discharge the defendant. To say that this issue may be held in abeyance, and that the prosecution may be continued, and that both the state and the defendant may be put to the expense, trouble, and delay of trying the case upon its merits on the plea of not guilty and settling the issue of immunity in the same trial, involves an absurdity upon its very face. Common sense, reason, and both the spirit and letter of our laws and Constitution requires that the question of immunity upon a proper plea in abatement should be settled by the trial judge before the defendant is placed upon trial upon the merits of the cause.

We are in no manner responsible for the hopeless confusion in which this question is involved in the statutes of other states of the Union. We are not concerned in the statutes of other states, and it is not our business to harmonize the conflicting decisions of other courts. Our whole duty is performed when we construe and enforce the Constitution and statutes of Oklahoma according to their true spirit and meaning. We concede the right of other states to settle questions of practice for themselves. We simply desire to vindicate the right of Oklahoma to the same thing. But we are not without ample authority in support of our position. As hereinbefore stated,

the Texas Court of Criminal Appeals is noted, not only for its signal ability, but also for its zealous devotion to the technical rights of a defendant. We are glad to note that this truly great court is in full harmony and accord with our views upon the issue of immunity, and also with our conclusion that this is a question which must be settled by the court and not by the jury.

We quote and adopt as a part of our opinion what that court said in the case of *Camron v. State*, 32 Tex. Cr. R. 181, 22 S. W. 682, 40 Am. St. Rep. 763:

"There is but one question that need be considered: Did the court err in striking out the plea? From the earliest times it has been found necessary, for the detection and punishment of crime, for the state to resort to the criminals themselves for testimony with which to convict their confederates in crime. While such a course offers a premium to treachery, and sometimes permits the more guilty to escape, it tends to prevent and break up combinations, by making criminals suspicious of each other, and it leads to the punishment of guilty persons who would otherwise escape. I Hale, P. C., 305; *Rex v. Rudd*, Cowp. 334; *People v. Whipple*, 9 Cow. [N. Y.] 707. Therefore, on the ground of public policy, it has been uniformly held that a state may contract with a criminal for his exemption from prosecution, if he shall honestly and fairly make a full disclosure of the crime, whether the party testified against is convicted or not. If his testimony is corrupt, or his disclosure is only partial, he gains nothing, but forfeits his right under the contract. 1 Bish. Crim. Proc. sec. 1164. The only difficulty in the matter seems to be as to the method in which the state may extend the promised and earned immunity. The common practice in American courts is to commit the question of receiving or rejecting an accomplice, and the further question of his immunity from punishment, solely to the discretion of the prosecuting officer, who acts by *nol. pros.* In those states where a *nol. pros.* can be only entered with the consent of the court, as in Texas, the court must, of course, exercise supervision over the question. 1 Bish. Crim. Proc. sec. 1161. But there is no question of the right of the prosecuting officer to act under and with the consent of the court in dismissing the cause. In some courts it has been

held that when the agreement has been made, and defendant has testified thereunder, and the attorney for the state refuses to recognize the agreement, the court will continue the cause to let the defendant obtain a pardon to plead in bar. 1 Bish. Crim. Proc. sec. 1164. This, however, cannot be done in Texas, as the pardoning power can only be invoked after conviction. Const. art. 4, sec. 11. In some courts it is held that where the accomplice is convicted after being made a witness by the state, and after having made a full confession, he has a claim for a judicial recommendation for pardon, which cannot be withheld without violating an established rule of practice. *State v. Graham,* 41 N. J. Law, 15 [32 Am. Rep. 174]; *State v. Lyon,* 81 N. C. 600 [31 Am. Rep. 518]; *United States v. Ford,* 99 U. S. 594 [25 L. Ed. 399]; *Garside's case,* 2 Lew. Crim. Cases, 38. But it would seem that the power of dealing with such agreements lies primarily with the prosecuting officer, and in Texas he may act with the consent of the court; and we can see no good reason why, when a defendant has in good faith carried out his agreement, the labor and expense to the state of a solemn trial should be incurred for the purpose of remitting the defendant to his remedy of pardon, to which, it is admitted, he is entitled as a matter of right. *Hardin's case,* 12 Tex. App. 189. If the state can make a contract with the defendant for immunity from prosecution of his offense, it is due to her own dignity that the contract be carried out in perfect faith. If the reason for convicting the defendant be to place on record the proof of his guilt, then it does not apply in Texas. Under articles 38 and 593, Code of Criminal Procedure, the prosecuting officer may, with the consent of the court, and for reasons filed and incorporated in the judgments of the court, *nolle prosequi* and dismiss the prosecution. It therefore remains a perpetual record of his self-confessed guilt. *Barrar's case,* 42 Tex. 264. In *Bowden's case,* 1 Tex. App. 144, the well-considered opinion, which was affirmed in *Hardin's case,* 12 Tex. App. 189, says it seems to have become a practice, recognized in our court, for the district attorney, with the concurrence of the court, to enter a *nolle prosequi* in case where it was deemed essential to the ends of justice that one or more defendants should turn state's evidence against his confederates (citing *Garrett v. State,* 41 Tex. 530; *Barrara v. State,* 42 Tex. 260; *Williams v. State,* 42 Tex. 392; *Wright v. State,* 43 Tex. 170), and the court

reversed the case because the defendant was tried and convicted on a subsequent indictment, while under contract with the state, as state's evidence. The court says: 'There has been no default on his part, and, until there is, the pledged faith of the state should have been kept inviolate in his immunity from further prosecution and punishment.' The only objection urged to a defense of this kind is in the *Holmes case,* 20 Tex. App. 517, and rests upon the ground that the Code forbids any special pleas except former conviction or acquittal (Code Criminal Procedure, article 525), and that this is in the nature of a plea of estoppel. We do not think such a defense as we are here considering comes under the character of special pleas which are to be submitted and passed upon by a jury * * * of former jeopardy ( *Johnson v. State,* 22 Tex. App. 222 [2 S. W. 609]), but rather belongs to those matters addressed solely to the consideration of the court, and for which a *nolle prosequi* should be entered or the case dismissed; and, where such a defense is set up, and not denied by the state, and it appears that a valid contract was made. by the proper officers representing the state, and the contract has been carried out by the defendant in good faith, the court should dismiss the cause, setting up in the judgment the reasons therefor."

It is worthy of remark that Judge Hurt, one of the ablest judges of criminal law, and certainly the greatest stickler for the technical rights of a defendant that America has ever produced, was presiding judge of the court at this time and concurred in this opinion. This should settle the question in the mind of any doubter of the doctrine of harmless error that this decision is technically correct. If the judge denies the plea of immunity, the evidence in support thereof can be preserved in a bill of exceptions and incorporated in the record in case of a conviction and appeal, and can be reviewed by this court. If the judge should sustain the plea of immunity and discharge the defendant the state could appeal directly as in cases in which a demurrer to an indictment or information has been sustained. In this way the rights of both sides can be presented, which cannot be done in any other way.

When the case before us was pending in the trial court,

appellant filed a plea in bar, the material portion of which is as follows:

"Comes now the defendant, Andy Scribner, and would ask the court to abate this cause and discharge the defendant for the following reasons, to wit: That he is immune. from prosecution in the matter, for the reason that he was subpœnaed by the state to appear as a witness before the grand jury having under investigation this killing of Lillie Scribner, and that in said investigation he gave testimony as to the kind of horse he rode on Sunday, about Frank Scribner being at Mr. Dority's on Saturday night and leaving there on Sunday, and other matters tending to show the, guilt of Frank Scribner. That the kind of horse the defendant was riding and the fact that Frank was in that community, and stayed all night at Mr. Dority's on Saturday night, are two · of the main circumstances upon which the state relies to convict Frank Scribner, as shown by the evidence in this case, a copy of which evidence both in the trial and on the plea of abatement is hereto attached, marked 'Exhibit A,' and made a part of this motion."

The court heard the evidence and the argument in support of the plea in bar and denied the same, to which counsel for appellant excepted. The court did not err in denying the plea in bar in this case, for it does not appear from the plea in bar, or from the evidence in support thereof, that the defendant did not testify voluntarily before the grand jury. He. made no objection to questions asked him, and did not claim exemption from self-incrimination, and was not compelled to answer any question. That he may .have testified reluctantly .would not entitle him to immunity. Therefore upon his own showing he was not entitled to immunity.

Some other questions are presented in the brief of counsel, but upon an examination of the entire record we have no doubt as to the guilt of appellant, and we believe that absolute justice was done in his conviction. In fact in our judgment his acquittal would have been a. miscarriage of justice.

Section 6005, Rev. Laws 1910, is as follows: .

"No judgment shall be set aside or new. trial granted by any appellate court in this state in any case, civil or criminal, on the ground of misdirection of the jury or the improper

admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless, in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

This relates only to matters of procedure, and is binding upon the court in all cases from the date upon which it went into effect. Here is a legislative acknowledgment and establishment of the doctrine of harmless error for which this court has unflinchingly stood from the day of its organization. Those who have been criticising the court on account of its decisions should turn their batteries on the Legislature who passed this law and on the Governor who approved it. It vindicates everything this court has said on this question, and, it matters not what the future personnel of this court may be, it settles the law of Oklahoma unless repealed by the Legislature.

We find no material error in the record. The judgment of the lower court is therefore in all things affirmed.

ARMSTRONG, P. J., and DOYLE, J., concur.